WINIFRED STEELE *vs.* COMMISSIONER OF BANKS
*in re* PRUDENTIAL TRUST COMPANY.

SIMON ROSEN *vs.* SAME.

MYER T. ORNSTEEN *vs.* SAME.

SAMUEL ORNSTEEN & another *vs.* SAME.

Suffolk.    November 17, 18, 1921. — February 28, 1922.

Present: RUGG, C. J., BRALEY, CROSBY, CARROLL, & JENNEY, JJ.

*Trust*, Constructive.   *Trust Company*, Receipt of deposit when insolvent.   *Equity Jurisdiction.*

While the receipt, by a trust company, at a time when it was reasonably apparent to its officers that it would presently be unable to meet its obligations as they were likely to mature and would be obliged to suspend its ordinary operation, of a deposit of money made in its commercial department by one who confided in its good reputation and in its representations is the equivalent of a preconceived purpose on the part of the bank not to pay and is a fraudulent act by reason of which the contract of deposit may be rescinded by the depositor and the deposit or its equivalent, if paid, may be recovered as can other trust funds, simple insolvency of the bank does not warrant the rescission of contracts of deposits if at the time they are made there is a genuine and reasonable hope, expectation and intention on the part of the officers of the bank to carry on — its business and to recover sound financial standing.

A certain trust company had not been complying with the statutory requirements as to reserves, had not kept the assets in its savings department separate and distinct from its general assets, and had been in an uncertain condition financially for some time but had been able to continue its business. Its officers, while knowing the foregoing facts, had not analyzed the situation but, in accepting deposits, had acted under the hope that the corporation in some way or other would pull through its difficulties and did not anticipate its closing. Within a few days after certain deposits were made in the commercial department, the commissioner of banks took possession of the bank's property and business. Those who made the late deposits sought by bills in equity to recover the deposits on the ground that they were impressed with a trust by reason of insolvency of the bank and the circumstances in which they were received.   *Held,* that

(1) In effect the plaintiff sought a preference over the other creditors;

(2) No equity was disclosed by reason of which the plaintiff should have such preference.

FOUR BILLS IN EQUITY, filed in the Supreme Judicial Court, the first on April 16, the second on April 26, and the third and

fourth on May 12, 1921, seeking the return of deposits made by the respective plaintiffs in the commercial department of the Prudential Trust Company shortly before its property and business were taken possession of by the commissioner of banks on September 10, 1920, the plaintiffs averring and contending that when the deposits were received the officers knew that the bank was hopelessly insolvent.

The suits were ordered to be consolidated for the purpose of being heard together and were referred to a master. It appeared that the plaintiff Steele deposited $375 in the trust company on September 8, 1920; that the plaintiff Rosen made twenty-seven deposits between August 4 and September 9, 1920, and that the balance due him on September 10 was $6,266.14; that the plaintiff Myer T. Ornsteen made fifteen deposits between June 8 and August 31, amounting in the aggregate to $58,096.99, and that his credit balance on September 10 was $19,098.21; and that the plaintiffs Samuel Ornsteen and William Ornsteen, doing business as Ornsteen Brothers, on July 24 made a deposit of $4,645.91 and that on September 10 they had a credit balance of $3,795.31.

Other material findings of the master are described in the opinion. The suits were reserved by order of *Braley*, J., for determination by the full court.

*J. B. Jacobs*, for the plaintiffs.

*J. E. Hannigan*, for the Prudential Trust Company.

RUGG, C. J. These are suits in equity whereby the several plaintiffs seek to recover from the defendant as commissioner of banks in possession of the property of the Prudential Trust Company the amounts of deposits made by them in the trust company while it was insolvent, on the ground that the trust company was known by its managers to be insolvent at the time of the receipt of the deposits, and that hence the bank became a trustee *ex maleficio* of the moneys thus deposited. The facts as to the financial condition of the trust company and the knowledge and intention of the executive officers concerning its future were briefly these: The bank was organized and opened for business in June, 1915. During the months of July, August and September, 1916, it had less than the required legal reserve every day (with three or four exceptions) by amounts ranging from $4,000 to $56,000. From October, 1916, through July, 1917, it had the required reserve

substantially all the time. From August, 1917, through January, 1918, it frequently had less than the legal reserve. From June, 1918, through September, 1919, there was a shortage in the reserve a good deal of the time. In October and November, 1919, conditions changed for the better. The largest deposit balance was $2,572,000, and the actual reserve reached its highest point with an excess in round figures of $267,000. Shortly thereafter began a steady general decline of deposits, interrupted occasionally by temporary increases. The reserve almost never equalled the legal requirements. During September, 1920, the deposits were not quite so low as in February, 1919. In April, 1920, a serious condition was discovered, due to the misconduct of the treasurer, who resigned shortly afterwards. He had made excessive loans to and suffered large overdrafts by a single depositor and borrower. Early in May the president of the trust company told the situation to the commissioner of banks. In order to tide over, ten directors gave their notes to the bank, aggregating $125,000, which was reported to have been acceptable to the bank commissioner. At about that time two offers, one for $135 per share and the other for $125 per share, were made for the outstanding stock of the trust company, although these offers did not develop into anything tangible. In August, 1920, the assistant treasurer bought twenty shares of stock at $160 per share. The master finds that the treasurer of the trust company knew its condition all the time, that the president knew it in a general way up to the time of the treasurer's retirement, and in detail thereafter, and that the assistant treasurer knew it from the commencement of his service with the bank in March, 1918, until it was closed. All three of these officers knew of the steady shrinkage of deposits, that the commercial department was burdened by a large amount in slow and doubtful loans, and that there were constant transfers of cash from the savings department to the commercial department, without which the latter would possibly not have had enough cash for its necessities. In accepting all the deposits the president and assistant treasurer "acted under a hope" that the trust company "would in some way or other pull through its difficulties, and did not anticipate its closing. Though both these men knew the facts . . . they never analyzed the situation." There was no evidence showing on the

part of either of these officers any personal fraudulent intent to bring about any gain or advantage for themselves by continuing to run the trust company and accept deposits, although, knowing the facts as to its condition, they knew it was insolvent. The trust company was closed by the commissioner on September 10, 1920.

Doubtless the trust company was insolvent at all the times when deposits were made here sought to be recovered. A trader or a bank commonly is insolvent when not in condition to pay its debts in the ordinary course, as persons carrying on trade or banking usually do. *Thompson* v. *Thompson*, 4 Cush. 127. *Lee* v. *Kilburn*, 3 Gray, 594, 600. *Vennard* v. *McConnell*, 11 Allen, 555, 561. *Peabody* v. *Knapp*, 153 Mass. 242. *Holbrook* v. *International Trust Co.*, 220 Mass. 150, 155.

Acceptance of deposits by a bank is a representation of solvency. A bank hopelessly insolvent receiving deposits from those who confide in its good reputation or in its representations, is held to knowledge that it cannot meet its obligations. Taking deposits under such circumstances is the equivalent of a preconceived purpose not to pay and is a fraudulent act. The contract of deposit may be rescinded by the depositor and the deposit, or its proceeds, if traced, may be recovered in like manner as other trust funds. On the other hand, simple insolvency, even of a bank, does not warrant the rescission of deposits if there are genuine and reasonable hope, expectation and intention on the part of the officers of the bank to carry on its business and to recover sound financial standing. To warrant such rescission there must be the further fact that it is reasonably apparent to its officers that the concern will presently be unable to meet its obligations as they are likely to mature and will be obliged to suspend its ordinary operation. The facts must establish the conclusion that the trust company accepted the deposit knowing through its officers that it would not and could not pay the money when demanded by the depositor. *Watson* v. *Silsby*, 166 Mass. 57, 59. *St. Louis & San Francisco Railway* v. *Johnston*, 133 U. S. 566, 576–578. *Williams* v. *Van Norden Trust Co.* 104 App. Div. (N. Y.) 251. *Roberts* v. *Hill*, 24 Fed. Rep. 571, 573. It was said in *Brennan* v. *Tillinghast*, 120 C. C. A. 37, (201 Fed. Rep. 609) "the mere fact that the bank is known to be insolvent at the time the deposit is received is not in our opinion sufficient of itself, without more,

to confer this right of rescission upon the depositor, and such right of rescission would not arise when the bank at the time of receiving the deposit, although embarrassed and insolvent, yet had reason to believe that by continuing in business it might retrieve its fortunes; the necessary condition upon which the right of rescission is predicated being that the deposit was received when the bank was hopelessly embarrassed and so circumstanced as to constitute its receipt of the deposit a fraud upon the depositor." A more drastic statement is to be found in some decisions where warranted or required by particular facts and where a comprehensive statement of a complete rule was not demanded. See, for example, *Grant* v. *Walsh,* 145 N. Y. 502; *Richardson* v. *New Orleans Coffee Co. Ltd.* 43 C. C. A. 583 (102 Fed. Rep. 785); *Williams* v. *Van Norden Trust Co.* 104 App. Div. (N. Y.) 251; *Western German Bank* v. *Norvell,* 69 C. C. A. 330 (134 Fed. Rep. 724).

In the case at bar it appears that the trust company, while not complying with the requirements of the statute as to reserves, and while not keeping the assets in its savings department separate and distinct from its general assets, was yet continuing to meet its obligations as and when they arose. The exact state of its affairs or the precise extent of its insolvency is not disclosed on this record. It had been apparently in a somewhat shaky condition for several years and yet had been able to continue its business. The commissioner took possession of its assets and property under G. L. c. 167, § 22. There is nothing to indicate that such action was anticipated by the officers or that they had any reason to expect that the institution might not continue for the next three or four years as it had during the past like period. Its deposits had been previously at a lower ebb than when closed by the commissioner, and had recovered. These suits in effect are claims against all the other creditors. This record discloses no equity in favor of these depositors against other depositors during this period of insolvency. In substance and effect the present plaintiffs are seeking a preference over other creditors which is not clearly established. A ratable distribution appears to be more likely to work out justice. The bill may be dismissed in each case with one bill of costs to the defendant.

*So ordered.*